UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

LORI P[1].,                          )
                                     )
                Plaintiff,           )
                                     )
        v.                           )        No. 1:19-cv-00875-DLP-SEB
                                     )
ANDREW M. SAUL,                      )
                                     )
                Defendant.           )

## ORDER

Plaintiff Lori P. seeks judicial review of the denial by the Commissioner of the

Social Security Administration ("Commissioner") of her application for Social Security

Disability Insurance Benefits ("DIB") under Title II and for Supplemental Security

Income ("SSI") under Title XVI of the Social Security Act ("the Act"). *See* 42 U.S.C. §§

423(d), 405(g). For the reasons set forth below, this Court hereby **REVERSES** the

ALJ's decision denying the Plaintiff benefits and **REMANDS** this matter for further

consideration.

## I.    PROCEDURAL HISTORY

On July 28, 2015, Lori filed an application for Title II disability and disability

insurance benefits, and on July 31, 2015, Lori filed an application for Title XVI

supplemental security income benefits, both of which alleged a disability onset date of

---

[1] In an effort to protect the privacy interests of claimants for Social Security benefits, the Southern
District of Indiana has adopted the recommendations put forth by the Court Administration and Case
Management Committee of the Administrative Office of the United States Courts regarding the
practice of using only the first name and last initial of any non-government parties in Social Security
opinions. The Undersigned has elected to implement that practice in this Order.

July 12, 2015. The claims were denied initially on March 30, 2016, and on reconsideration on July 29, 2016. Lori filed a written request for a hearing on August 3, 2016, which was granted. On March 9, 2018, Administrative Law Judge ("ALJ") Diane S. Davis conducted a hearing, where Lori, vocational expert Tobey Andre, and Lori's treating psychologist, David Coleman, Ph.D., testified. On May 31, 2018, ALJ Davis issued an unfavorable decision finding that Lori was not disabled. (Dkt. 10-2 at 31, R. 30). The Appeals Council denied Lori's request for review of the ALJ's decision on December 18, 2018, making the ALJ's decision final. (Dkt. 10-2 at 2, R. 1). Lori now requests judicial review of the Commissioner's decision. *See* 42 U.S.C. § 1383(c)(3).

## II. STANDARD OF REVIEW

To prove disability, a claimant must show she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). To meet this definition, a claimant's impairments must be of such severity that she is not able to perform the work she previously engaged in and, based on her age, education, and work experience, she cannot engage in any other kind of substantial gainful work that exists in significant numbers in the national economy. 42 U.S.C. § 423(d)(2)(A). The Social Security Administration ("SSA") has implemented these statutory standards by, in part, prescribing a five-step sequential

evaluation process for determining disability. 20 C.F.R. §§ 404.1520(a), 416.920(a).

The ALJ must consider whether:

> (1) the claimant is presently [un]employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves [her] unable to perform [her] past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy.

*Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005) (citation omitted). An affirmative answer to each step leads either to the next step or, at steps three and five, to a finding that the claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920; *Briscoe*, 425 F.3d at 352. If a claimant satisfies steps one or two, but not three, then he must satisfy step four. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995)*; see also* 20 C.F.R. §§ 404.1520, 416.920 (A negative answer at any point, other than step three, terminates the inquiry and leads to a determination that the claimant is not disabled).

After step three but before step four, the ALJ must determine a claimant's residual functional capacity ("RFC") by evaluating "all limitations that arise from medically determinable impairments, even those that are not severe." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). In doing so, the ALJ "may not dismiss a line of evidence contrary to the ruling." *Id*. The ALJ uses the RFC at step four to determine whether the claimant can perform her own past relevant work and, if not, at step five to determine whether the claimant can perform other work in the national economy. *See Knight*, 55 F.3d at 313; *see also* 20 C.F.R. §§ 404.1520(iv), (v), 416.920(iv), (v). The claimant bears the burden of proof through step four. *Briscoe*,

425 F.3d at 352. If the first four steps are met, the burden shifts to the Commissioner at step five. *Id*. The Commissioner must then establish that the claimant—in light of her age, education, job experience, and residual functional capacity to work—is capable of performing other work and that such work exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1520(f), 416.920(f).

The Court reviews the Commissioner's denial of benefits to determine whether it was supported by substantial evidence or is the result of an error of law. *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). Evidence is substantial when it is sufficient for a reasonable person to conclude that the evidence supports the decision. *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). The standard demands more than a scintilla of evidentiary support but does not demand a preponderance of the evidence. *Wood v. Thompson,* 246 F.3d 1026, 1029 (7th Cir. 2001). Thus, the issue before the Court is not whether Lori is disabled, but, rather, whether the ALJ's findings were supported by substantial evidence. *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995).

In this substantial-evidence determination, the Court must consider the entire administrative record but not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Nevertheless, the Court must conduct a critical review of the evidence before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *see also Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

When an ALJ denies benefits, she must build an "accurate and logical bridge from the evidence to [the] conclusion," *Clifford*, 227 F.3d at 872, articulating a minimal, but legitimate, justification for her decision to accept or reject specific evidence of a disability. *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004). The ALJ need not address every piece of evidence in her decision, but cannot ignore a line of evidence that undermines the conclusions she made, and she must trace the path of her reasoning and connect the evidence to her findings and conclusions. *Arnett v. Astrue,* 676 F.3d 586, 592 (7th Cir. 2012); *Clifford,* 227 F.3d at 872.

### III.  BACKGROUND

#### A.  Factual Background

Lori was 39 years old as of her alleged onset date and is now 44 years old. (Dkt. 10-5 at 2, R. 231). Lori has a high school education. (Dkt. 10-2 at 43, R. 42). She has past relevant work history as a housekeeper, hand packager, and inspector-packager. (Dkt. 10-2 at 29, R. 28).

#### B.  Medical History

On February 25, 2015, Lori presented to St. Elizabeth East with a sudden onset of shortness of breath and wheezing. (Dkt. 10-8 at 11, R. 387). After she underwent various testing and was deemed in stable condition, she was discharged with diagnoses of asthma exacerbation, obesity, tobacco abuse disorder, and bronchitis. (Id. at 4, R. 380).

On April 15, 2015, Lori reported to St. Vincent Williamsport Hospital with complaints of dry heaving and diarrhea. (Dkt. 10-9 at 39, R. 440). Due to her

complaints of diarrhea and abdominal pain, Lori underwent a CT scan of the abdomen and pelvis on April 16, 2015. (Dkt. 10-9 at 33, R. 434). The scan revealed distal colonic diverticular disease without evidence of acute diverticulitis. (Id). On that same date, a chest x-ray was performed, which revealed no active disease. (Dkt. 10-9 at 35, R. 436). She was diagnosed with an asthma exacerbation and abdominal pain and was discharged. (Id. at 38, R. 439).

On June 9, 2015, Lori presented to St. Vincent Williamsport Hospital reporting that she had hit her head two days earlier and that she had been experiencing nausea, vomiting, diarrhea, and headaches ever since. (Dkt. 10-9 at 15, R. 416). Both the CT scan of her head and her cervical spine were negative for any injuries or abnormalities. (Id. at 16-17, R. 417-18). She was diagnosed with a headache and concussive syndrome. (Id. at 18, R. 419).

About one month later, on July 8, 2015, Lori was evaluated at the St. Vincent Williamsport Walk-In Clinic for complaints of productive cough, throat pain, wheezing, shortness of breath, swelling in the extremities, and moist skin. (Dkt. 10-11 at 16, 18 R. 516, 520). She was diagnosed with respiratory distress and asthma exacerbation; advised to stop smoking, decrease the number of animals in her home, decrease exposure to chemicals, and increase oral fluid intake; and further advised to seek evaluation and treatment at the St. Vincent Williamsport Hospital emergency room. (Id. at 19, R. 521). Lori went to St. Vincent Williamsport Hospital on July 8, 2015 as advised. (Dkt. 10-9 at 49, R. 450). Scans showed very minimal streaky opacities in her right lung and mild hypertrophy of the adenoids, but were otherwise

normal. (Id. at 43-44, R. 444-45). She was discharged with diagnoses of laryngitis and tobacco abuse. (Id. at 46, R. 447).

On July 14, 2015, Lori presented to the St. Vincent Williamsport Walk-In Clinic with a complaint of shortness of breath aggravated by the chemicals at her current job. (Dkt. 10-11 at 14, R. 516). She was given prednisone, amoxicillin, and cough medication, and cleared to return to work the next day. (Id)

On September 3, 2015, Lori returned to her primary care physician, Dr. Steven Fischer, with complaints of shortness of breath, migraines, heavy periods, and a sore throat. (Dkt. 10-13 at 32, R. 676). Lori reported that she had been diagnosed with chronic obstructive pulmonary disease ("COPD"). (Id). She also indicated that her shortness of breath had worsened, she had run out of her nebulizer medication, and that she had experienced several episodes of a swollen, sore throat. (Id. at 34, R. 678). Dr. Fischer diagnosed Lori with chronic obstructive lung disease, dyspnea, acute bronchitis, and nicotine dependence, and referred her to a pulmonologist. (Id. at 35, R. 679).

On September 21, 2015, James C. Ascough, Ph.D, HSPP performed a consultative psychological evaluation of Lori at the request of the SSA. (Dkt. 10-11 at 57, R. 559). Lori reported that after high school, she did laundry and housekeeping at a nursing home and worked for fifteen years at a meat packing factory. (Id. at 58, R. 560). She indicated that she had been depressed since her mother passed away when she was five (5) years old, that she underwent outpatient therapy in her early teens, and that her depression had increased when she was about 20 because she had a son who passed away. (Id). Lori further noted that her COPD had caused much difficulty

with her lungs and that she used a nebulizer four times a day. (Id). Her affect was depressed, and she indicated that her home life had been difficult lately. (Id. at 59, R. 561). She had a routine for personal habits that she followed on a daily basis, that included cooking full meals and taking her son to and from school, shopping for groceries as needed, and doing laundry every other day. (Id). Dr. Ascough diagnosed Lori with major depressive disorder. (Id. at 60, R. 562).

On September 25, 2015, Dr. Anthony Conrardy performed a consultative examination of Lori on request of the SSA. (Dkt. 10-11 at 62, R. 564). Lori reported that her main impairments were COPD, chronic asthma, and chronic lung disease. (Id). She indicated that she performed activities of personal hygiene and daily living, such as cooking, cleaning, shopping, and driving, but that she performed those activities slowly. (Id). During the examination, Dr. Conrardy was unable to complete a pulmonary function test for Lori because she threw up, began wheezing, and had shortness of breath. (Id. at 63, R. 565). Dr. Conrardy noted that Lori had trouble getting on and off the exam table and was unable to do the straight leg test because she was unable to lie flat on the table. (Id). Dr. Conrardy concluded that Lori's main restriction was her COPD that restricted her from any kind of physical activity due to shortness of breath. (Id. at 64, R. 566). Lori could not climb stairs or ladders due to shortness of breath; her gait was slow, but normal; she did not use a cane; she had normal gross and fine hand manipulation and normal grip strength. (Id). Dr. Conrardy recommended that she go to the emergency room or to a pulmonary doctor if her lung problems got any worse. (Id). A pulmonary function test report attached to

Dr. Conrardy's report stated: "Caution: No Acceptable Maneuvers – Interpret With Care." (Id. at 67, R. 569).

On October 5, 2015, Lori presented to Dr. Ajay Deshpande at the Williamsport Clinic to establish care for her COPD. (Dkt. 10-11 at 72, R. 574). She noted symptoms of shortness of breath, wheezing, chest pain, chest pressure, and chest congestion. (Id). Lori underwent a pulmonary function test which revealed an FEV1[2] of 27%, with Dr. Deshpande noting that she gave suboptimal effort. (Id. at 73, R. 575). Dr. Deshpande diagnosed Lori with COPD, bronchitis, and nicotine dependence; adjusted her medications for her COPD; and advised her to quit smoking entirely. (Id).

A gynecological ultrasound performed on October 6, 2015 revealed an enlarged uterus, dysfunctional uterine bleeding, and pelvic pain. (Dkt. 10-12 at 54, R. 635). Due to her pelvic pain, endometriosis, and cervical dysplasia, on October 19, 2015, Lori underwent a hysterectomy and bilateral salpingo-oophorectomy. (Dkt. 10-12 at 4, R. 585). During the pre-operative check, a chest x-ray revealed no acute cardiopulmonary processes and no significant changes compared to her previous x-rays. (Id. at 52, R. 633).

On October 27, 2015, Lori returned to Dr. Fischer with complaints of migraines for several weeks. (Dkt. 10-13 at 27, R. 671). She was diagnosed with a migraine and referred to neurology. (Id. at 31, R. 675).

---

[2] A forced expiratory volume (FEV) measures how much air a person can exhale during a forced breath. FEV1 measures the amount of air exhaled on the first second of the forced breath. *Forced Expiratory Volume and Forced Vital Capacity*, https://www.uofmhealth.org/health-library/aa73564.

Lori returned to Dr. Deshpande on November 30, 2015 for her continued shortness of breath, cough, wheezing, and chest pain. (Dkt. 10-14 at 86, R. 781). A chest x-ray completed on November 30, 2015 revealed a normal chest. (Dkt. 10-13 at 48, R. 692). She was diagnosed with COPD, bronchitis, and nicotine dependence. (Dkt. 10-14 at 87, R. 782). Her medications were renewed, and she was again advised to stop smoking. (Id).

On January 14, 2016, Lori reported to Dr. Michael Stewart with St. Vincent Williamsport Medical, due to complaints of poor appetite, diarrhea, bloating, chills, sweating, dizziness, and blood in her urine. (Dkt. 10-13 at 23, R. 667). She was immediately referred for a chest x-ray and a CT scan of the chest and abdomen. (Id. at 26, R. 670). A chest x-ray completed on January 14, 2016 revealed no evidence of acute cardiopulmonary disease and a normal bowel gas pattern. (Dkt. 10-13 at 43, R. 687). A CT scan of the abdomen and pelvis performed on January 21, 2016 revealed a fatty liver and low-grade diverticulitis in the mid sigmoid colon. (Id. at 41, R. 685).

On February 29, 2016, Lori presented to the St. Vincent Williamsport Hospital emergency room with complaints of sore throat, cough, vomiting, diarrhea, weakness, shortness of breath, leg swelling, dehydration, and poor balance. (Dkt. 10-14 at 81-82, R. 776-77). A CT scan of the brain and head performed on March 1, 2016 revealed no evidence of acute intracranial abnormality. (Dkt. 10-14 at 65, R. 760). A CT scan of the abdomen and pelvis performed that same day revealed diverticulosis with improved inflammatory change to the sigmoid colon and diffuse fatty infiltration of the liver. (Id. at 67, R. 762). Lori was admitted for diagnoses of gastroenteritis and dehydration. (Dkt. 10-15 at 42, R. 829).

During her inpatient stay, Lori was evaluated by Dr. Sean Sharma for an internal medicine consultation. (Dkt. 10-14 at 7, R. 702). Dr. Sharma indicated that Lori's dehydration and gastroenteritis had clinically improved; her leukocytosis and hemoconcentration had resolved; and that her altered mental status, headache, weakness, and other neurological concerns including gait abnormality may warrant a neuropsychiatric consultation. (Id. at 8, R. 703). Dr. Sharma also considered that Lori was suffering from conversion disorder based on her symptoms and neurological exam. (Id). Dr. Sharma questioned Lori's diagnosis of COPD and noted that this would need to be clarified. (Id).

Dr. Hassan Arif evaluated Lori in consultation on March 3, 2016 for her neurological complaints. (Dkt. 10-15 at 43, R. 830). He referred Lori for an MRI of the brain to determine any intracranial pathologies and advised that she continue management of her gastroenteritis. (Id. at 91, R. 786). The MRI of the head and brain performed on March 2, 2016 was normal. (Id. at 70, R. 765). As of the morning of March 3, 2016, Lori was in no acute distress, her vital signs were stable, and her scans were normal. (Dkt. 10-15 at 42, R. 829). Lori had some diminished sensation in her lower extremities and was quite concerned that there was more wrong with her than the hospital was able to detect. (Id). Lori was discharged from St. Vincent Williamsport Hospital on March 3, 2016 with diagnoses of upper extremity, lower extremity, and facial paresthesias, and probable conversion disorder. (Id.). To address

her psychiatric concerns, Lori was transferred to St. Vincent Hospital in Indianapolis[3] upon her discharge from Williamsport. (Dkt. 10-15 at 43, R. 830).

Lori presented to Dr. Fischer on March 11, 2016 with complaints of continued numbness throughout her body, nausea, and diarrhea. (Dkt. 10-15 at 4, R. 791). She reported that the treating psychologist thought her symptoms were a secondary effect of post-traumatic stress disorder ("PTSD") or some other psychosomatic disorder. (Id). Lori was diagnosed with weakness, numbness, nausea, altered bowel function, chronic obstructive lung disease, PTSD, and psychologic conversion disorder, for which she was referred to gastroenterology and psychology, and prescribed a walker and bedside commode. (Id. at 5, R. 792).

On April 1, 2016, Lori was evaluated by Dr. Jatinder Kaushal at St. Vincent Williamsport Hospital for her numbness, tingling, nausea, and diarrhea. (Dkt. 10-15 at 25, R. 812). For approximately six months, Lori experienced loose bowel movements for several days, followed by hard stools and constipation for several days. (Id). Her colonoscopy was normal. (Id). Dr. Kaushal diagnosed Lori with irritable bowel syndrome. (Id).

On April 13, 2016, Lori returned to Dr. Fischer with complaints of headache and anxiety. (Dkt. 10-15 at 35, R. 822). Lori reported that her medications were not working properly, that she was still getting pain down her right leg into her toes, and that she was still having migraines on the right side of her head. (Id. at 37, R. 824). On examination, her right leg and knee were very painful and tender to palpation.

---

[3] There are no records of Lori's hospitalization at St. Vincent Hospital in Indianapolis.

(Id. at 38, R. 825). Lori was diagnosed with irritable bowel syndrome, right leg and knee pain, for which she was referred for x-rays, chronic obstructive lung disease, asthma, and PTSD. (Id). An x-ray of the right knee performed on April 15, 2016 was normal. (Dkt. 10-15 at 40, R. 827).

On April 18, 2016, Lori presented to Dave Coleman, Ph.D., HSPP for a mental status examination based on a referral by Dr. Fischer. (Dkt. 10-15 at 71, R. 858). She reported that the psychologist at Williamsport Hospital said "she had PTSD and her mind was separating from her body." (Id). Lori indicated that when she had been hospitalized, she lost her sense of taste and had a roaring noise in her ears, and that prior to her collapsing she had a migraine in the right parietal area that caused pain and numbness. (Id). Dr. Coleman diagnosed Lori with PTSD and possible bipolar II disorder. (Id. at 72, R. 859).

Lori returned to Dr. Fischer on June 13, 2016 for a follow-up visit. (Dkt. 10-15 at 31, R. 818). Lori reported that she needed to switch asthma medications due to her insurance coverage. (Id). Lori's medications for her chronic obstructive lung disease and right leg pain were modified and she was advised to return in a month. (Id. at 34, R. 821).

On July 8, 2016, Dr. Coleman sent a letter to Dr. Fischer noting that Lori had depression, PTSD, and bipolar symptoms. (Dkt. 10-15 at 74, R. 861). Dr. Coleman requested an update on Lori's current medications so that he could make recommendations to address her conditions. (Id). On August 24, 2016, Dr. Coleman sent a letter to Dr. Fischer regarding Lori's treatment. (Dkt. 10-15 at 76, R. 863). He diagnosed her with major depression, PTSD, and possibly bipolar disorder. (Id). He

recommended that she be prescribed both a mood stabilizer and an atypical antipsychotic, in order to have more control over her sleep, anger, anxiety, and racing thoughts. (Id.)

On October 3, 2016, Lori returned to Dr. Fischer for a three-month check-up. (Dkt. 10-15 at 55, R. 842). Lori wanted to discuss Dr. Coleman's last consult and his medication recommendations. (Id.). Lori reported fatigue, sleep deprivation, and lethargy, but did admit that she no longer smokes. (Id. at 57, R. 844). Dr. Fischer diagnosed her with depressive disorder, PTSD, chronic obstructive lung disease, asthma, and insomnia. (Id. at 58, R. 845).

On January 16, 2017, a chest x-ray revealed no active disease. (Dkt. 10-15 at 70, R. 857). A year later, on January 17, 2018, Lori presented to Dr. Diane Zaragoza with St. Vincent Williamsport Medical to establish care. (Dkt. 10-15 at 66, R. 853). Lori reported that she used to see Dr. Fischer, had a history of COPD, restless legs, conversion disorder, and PTSD. (Id. at 68, R. 855). She reported that she had been smoking on and off, but had been mostly smoke free for two years. (Id). Dr. Zaragoza diagnosed Lori with chronic obstructive lung disease, restless legs, edema, and asthma. (Id. at 69, R. 856). Dr. Zaragoza renewed Lori's nebulizer prescription, advised her to use it four times per day, and provided her with five refills. (Id).

On January 25, 2018, Dr. Coleman evaluated Lori and sent a letter to Dr. Zaragoza outlining their treatment session. (Dkt. 10-15 at 80, R. 867) Dr. Coleman indicated that he had diagnosed Lori with PTSD, but that she also had symptoms of bipolar or schizoaffective disorder. (Id). Lori had reported that she did not sleep for 2-3 days at a time, is constantly angry, hears voices, and had been dissociating with

increasing frequency. (Id). Due to a lapse in Lori's insurance, she had been without medication for several months. (Id). Dr. Coleman recommended a dosage increase in her new medications. (Id).

### C. ALJ Decision

In determining whether Lori qualified for benefits under the Act, the ALJ went through the analysis set forth in 20 C.F.R. §§ 404.1520(a) and 416.920(a) and concluded that Lori was not disabled. (Dkt. 10-2 at 30, R. 29). At step one, the ALJ found that Lori was insured through December 31, 2020 and had not engaged in substantial gainful activity since her alleged onset of disability of July 12, 2015. (Dkt. 10-2 at 20, R. 19).

At step two, the ALJ found that Lori had severe impairments of asthma, COPD, obesity, post-traumatic stress disorder, and major depressive disorder. (Id). The ALJ also found that Lori had non-severe impairments of irritable bowel syndrome; headaches; a history of hysterectomy with bilateral oophorectomy; restless leg syndrome; lumbar degenerative disc disease; and knee pain. (Id. at 21, R. 20).

At step three, the ALJ considered Lori's chronic respiratory disorders under Listing 3.02; asthma under Listing 3.03; mental impairments under Listings 12.04 and 12.15; and obesity pursuant to Social Security Ruling 02-1p. (Id. at 22, R. 21). The ALJ determined that Lori did not meet or medically equal any listing. (Id. at 21, R. 20).

After step three, but before step four, the ALJ determined that Lori had the RFC to perform light work, as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b),

except that she could stand for thirty minutes at one time and for four (4) hours total in an 8-hour workday; sit for two (2) hours at one time and for six (6) hours total in an 8-hour workday; constantly perform gross manipulation bilaterally; frequently bend, perform fine manipulation bilaterally, and frequently work overhead bilaterally; frequently work around dangerous equipment and operate a motor vehicle; occasionally stoop, balance, tolerate occasional exposure to extreme temperatures, pulmonary irritants, and loud noise; understand, remember, and carry out simple, routine tasks; make simple work-related decisions; adapt to routine workplace changes; and tolerate occasional interaction with supervisors, co-workers, and the public. (Dkt. 10-2 at 23-24, R. 22-23).

At step four, the ALJ concluded that Lori could not perform any of her past relevant work. (Dkt. 10-2 at 29, R. 28). At step five, relying on the vocational expert's testimony, the ALJ determined that Lori could perform other jobs that exist in significant numbers in the national economy, such as mail clerk, small products assembler, and sorter. (Id. at 30, R. 29). Accordingly, the ALJ found that Lori was not disabled. (Id.)

## IV. Analysis

Lori challenges the ALJ's decision on four grounds. First, she asserts that the ALJ failed to obtain and compile into the record existing significant medical evidence. Secondly, she argues that the ALJ erred by giving no weight to Plaintiff's treating psychologist, Dr. David Coleman. Third, Lori contends that the ALJ's residual functional capacity analysis is not supported by substantial evidence. Finally, Lori

argues that the ALJ erred by determining that she did not meet Listing 3.02A. The Court will address each challenge in turn.

## A.   Duty to Develop the Record

First, the Plaintiff argues that the ALJ failed to develop the record adequately by not obtaining records of Lori's inpatient hospitalization at St. Vincent Hospital in March 2016. (Dkt. 13 at 5-6). Lori contends that this information is pivotal to her disability claim because it demonstrates her mental health treatment and PTSD diagnosis. (Dkt. 13 at 7). Lori maintains that even though the ALJ referenced the hospitalization in her opinion and that it came up several times during the hearing, the ALJ's failure to obtain these records and include them as part of the record is reversible error. (Id. at 6-7).

The Commissioner argues in response that the ALJ was not required to gather additional medical evidence because Lori's counsel indicated at the hearing that the record was complete. (Dkt. 19 at 27). Relying on *Nelms v. Astrue*, 553 F.3d 1093 (7th Cir. 2009), the Commissioner maintains that courts generally uphold the ALJ's reasoned judgment on how much evidence to gather. (Dkt. 19 at 28). Moreover, to the extent that any additional records existed, the Commissioner argues that it was the Plaintiff's burden to obtain and present those records to the ALJ, Appeals Council, or to this Court, rather than the ALJ's burden. (Id. at 28).

Although a claimant has the burden to prove disability[4], the ALJ has an independent duty to develop a full and fair record. *See Bowen v. Yuckert*, 482 U.S. 137

---

[4] It is Plaintiff's burden to come up with some medical evidence to prove she is disabled. *Davenport v. Berryhill*, 721 F. App'x 524, 527 (7th Cir. 2018) (claimant bears the burden of establishing the

(1987); *Thompson v. Sullivan*, 933 F.2d 581, 585 (7th Cir. 1991); *see also* 20 C.F.R. §§ 404.1512(b)(1), 416.912(b). This duty is not eliminated when a claimant has counsel. *Collins v. Berryhill*, 743 F. App'x 21, 25 (7th Cir. 2018). A full and fair record will provide the ALJ with sufficient facts on which to make an informed decision, and it will also demonstrate that her decision is supported by substantial evidence. *Clark v. Berryhill*, 402 F. Supp. 3d 541, 544-45 (W.D. Wis. 2019). An ALJ's failure to fulfill this obligation is "good cause" to remand for gathering of additional evidence, if the claimant can demonstrate prejudice. *Thompson v. Sullivan*, 933 F.2d at 586; *see also Nelms*, 553 F.3d at 1097 (concluding that an ALJ's failure to fairly and fully develop the record is error, as long as the claimant can show prejudice); *Martin v. Astrue*, 345 F. App'x 197, 202 (7th Cir. 2009) (holding that remand in unnecessary where the claimant does not show that they were prejudiced by the ALJ's failure to adequately develop the record).

In this case, the ALJ was never alerted to the fact that any medical documentation was missing from the record because Lori's attorney indicated at the hearing that the record, as presented, was complete. (Dkt. 10-2 at 42, R. 41). Thus, the ALJ had no reason to believe that she did not have a full and complete record. Regardless, the Plaintiff now contends that the ALJ's failure to obtain missing medical records from March 2016 is reversible error. Even if the Court finds that the ALJ erred in failing to collect these medical records, which it does not, Lori has not

existence of a severe impairment through medical records); *Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008); *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004); *see also* 20 C.F.R. § 404.1512(c) ("You must provide medical evidence showing that you have an impairment and how severe it is during the time you say that you were disabled.").

demonstrated any prejudice in the ALJ's failure to supplement the record. Here, the claimant argues that these records are needed because it would support her claim of disability by showing her post-traumatic stress disorder diagnosis and her treatment for mental health issues. When reviewing the record, the ALJ found, without the March 2016 medical records, that Lori had severe impairments of both PTSD and major depressive disorder. (Dkt. 10-2 at 20, R. 19). Both at the hearing and in her decision, the ALJ provided ample evidence of the mental health treatment that Lori had received since September 2015, which was several months after Lori's application was filed. (Dkt. 10-2 at 25-26, R. 24-25).

The ALJ considered all records surrounding the March 2016 hospitalization in Indianapolis, including the treatment records from Williamsport that led to the hospitalization in Indianapolis, and the subsequent records that referenced Lori's potential diagnoses from Indianapolis. (Id). The ALJ also noted that after the hospitalization in March 2016, Lori visited with a psychologist that diagnosed her with PTSD. (Dkt. 10-15 at 34, 38). Even without records of the March 2016 hospitalization itself, the ALJ accepted Lori's diagnoses of PTSD in order to include it as a severe impairment at step three. Therefore, without more, the claimant is unable to demonstrate prejudice from any alleged error; thus, on this issue, the ALJ's decision is affirmed.

### B. Weight to Treating Psychologist Dr. David Coleman

Lori's second argument is that the ALJ erred by giving no weight to Dr. David Coleman's testimony. (Dkt. 13 at 7). She asserts that the ALJ may not reject a

psychological assessment merely because it was based on the claimant's subjective complaints. (Id). Due to the fact that he treated her in 12 visits over a two-year period from April 2016 through January 2018 and testified as such, Lori maintains that it was improper for the ALJ to reject Dr. Coleman's opinion. (Id. at 9-10). Finally, Lori contends that the ALJ erred by not discussing Dr. Coleman's Medical Statement Concerning Depression with Anxiety, OCD, PTSD or Panic Disorder for Social Security Disability Claim, which he completed on April 25, 2016, wherein he indicated that Lori was moderately to extremely limited in all activities. (Dkt. 13 at 11). Lori maintains that Dr. Coleman's findings in the Medical Statement are supported both by his medical records and testimony. (Dkt. 13 at 11).

The Commissioner asserts in response that the ALJ's decision declining to give weight to Dr. Coleman's opinion was reasonable because she provided good reasons for doing so. (Dkt. 19 at 24). Her good reasons were: the opinion was not supported by the record or his own notes; Dr. Coleman only treated Lori sporadically over a two year period; he had very little knowledge of the SSA regulatory requirements; his payment was contingent upon Lori being awarded benefits; his notes did not include any objective findings; and he did not review any of Lori's medical or psychiatric records. (Id. at 25). Additionally, the Commissioner argues that the ALJ was not required to discuss every piece of evidence in the record, including Dr. Coleman's Medical Statement. (Id. at 26).

Under the "treating physician rule" which applies to Lori's claim, an ALJ should give controlling weight to the treating physician's opinion as long as it is supported by medical findings and consistent with substantial evidence in the record.

See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Gerstner v. Berryhill*, 879 F.3d 257, 261 (7th Cir. 2018) (noting that the treating physician rule applies only to claims filed before March 27, 2017). An ALJ is authorized, however, to reject a treating physician's opinion, so long as she offers "good reasons" for doing so. *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). "[A] claimant is not entitled to [disability benefits] simply because [her] treating physician states that [s]he is 'unable to work' or 'disabled.'" *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). This determination is reserved for the Commissioner. *Id.*; *Diaz v. Chater*, 55 F.3d 300, 306 n. 2 (7th Cir. 1995); *see also* 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1).

"If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Scott*, 647 F.3d at 740 (citing *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009)); *see* 20 C.F.R. §§ 416.927(c), 404.1527(c). The ALJ may also consider other factors, such as the amount of understanding of the SSA disability programs and their evidentiary requirements, as well as the extent to which the physician is familiar with the other information in the claimant's case record. 20 C.F.R. §§ 404.1527(c), 416.927(c).

In this case, the ALJ discounted Dr. Coleman's assessment with the following explanation:

The claimant's psychologist, Dr. David Allen Coleman, testified that he began treating the claimant in April 2016. Dr. Coleman testified that the claimant cannot perform any meaningful work because of her depression, anxiety, mental confusion, and intrusive memories of loss. He also testified that the claimant meets listing level for the affective disorders criteria, the anxiety disorders criteria, and the somatoform criteria. The undersigned gives no weight to Dr. Coleman's testimony and opinion. Dr. Coleman admitted that he had never testified as part of a Social Security hearing before, and although he reviewed the applicable mental listings for one hour in preparation for the hearing, he does not have significant knowledge of the disability program. Dr. Coleman also noted that his payment was contingent on the claimant receiving approval for disability, so he has a vested interest in her receiving benefits. Dr. Coleman indicated that he makes no therapy notes of his visits, and his treatment of the claimant was limited to 12 visits since April 2016. Dr. Coleman testified that he did not review any records from the claimant's other providers, and his own treating records do not include objective findings. Accordingly, all of his findings and conclusions appear to be based solely on the claimant's subjective reports to him. The severe limitations he indicated are also inconsistent with the normal mental status examinations throughout the treating record (17F/4; 20F/3; 23F/4, 8; 25F/4).

(Dkt. 10-2 at 28, R. 27).

The ALJ here considered each of the necessary regulatory factors. She specifically mentioned the length, nature, and extent of Dr. Coleman's treating relationship with Lori; indicated the frequency of Dr. Coleman's examinations; noted that Dr. Coleman was a psychologist; stated that Dr. Coleman did not maintain treatment notes and also appeared to base his findings and conclusions solely on Lori's subjective complaints; indicated that Dr. Coleman's payment was contingent on Lori receiving approval of her disability benefits; and noted that Dr. Coleman had never testified in an SSA hearing before and was not significantly familiar with the disability program. (Id). Additionally, the ALJ explicitly notes instances in the record where Lori had normal mental status examinations with her treating physician. (Id).

While the ALJ provided reasons to justify her decision to give no weight to Dr. Coleman's opinion, for the most part, those reasons are inaccurate and not supported by the evidence. First, the ALJ seems dismissive of Dr. Coleman at the hearing and in her opinion simply because he is a psychologist rather than a psychiatrist. The ALJ repeatedly asked Lori during the hearing why she had not seen a psychiatrist, even though Lori continuously referenced her treating relationship with Dr. Coleman. (Dkt. 10-2 at 49-50, 56, R. 48-49, 55). At the hearing and in her opinion, the ALJ continually makes notes of the fact that because Dr. Coleman is a psychologist and not a psychiatrist, he is not permitted to prescribe medications and, in fact, "does not have the medical expertise" to do so. (Dkt. 10-2 at 74, R. 73; Dkt. 10-2 at 27, R. 26). The Court fails to understand the ALJ's reasoning for discounting Dr. Coleman's testimony regarding Lori's mental health diagnosis and treatment simply because he is a psychologist and not a psychiatrist.

Next, the ALJ seems to minimize Dr. Coleman's treating relationship with Lori – twelve treatment sessions in two years is not insignificant.[5] In fact, this treating relationship has twelve more in-person evaluations than the state agency physicians to whose opinions the ALJ gave partial weight. The ALJ also dismisses Dr. Coleman's opinion because his payment was contingent on Lori being awarded disability benefits. While Dr. Coleman testified that he had never appeared at an SSA hearing on behalf of a patient before, the fact that Dr. Coleman chose to appear at the hearing

---

[5] The Court does note Dr. Coleman's testimony that he saw Lori nine times in 2016, two times in 2017, and once in 2018 prior to the hearing. He indicated that the visits decreased in frequency during 2017 because Lori's anxiety and depression kept her from leaving the house. (Dkt. 10-2 at 68, R. 67). Lori also indicated that she had lost her insurance coverage for a significant period of time, which contributed to the lack of mental health treatment as well. (Dkt. 10-15 at 80, R. 867).

on Lori's behalf as her medical expert does not automatically render him biased or nonobjective. *See Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011) (fact that physician's testimony was solicited by the claimant is not sufficient justification for belittling that evidence, because it is normal to ask a treating physician to weigh in on the claimant's impairments). The ALJ's point here, while technically accurate, does not persuade the Court to find that her decision to discount Dr. Coleman's medical opinion was justified.

As for another reason to discount Dr. Coleman's opinion, the ALJ stated that Dr. Coleman did not maintain therapy notes; a review of the hearing transcript, however, shows that this conclusion is inaccurate when viewed in the appropriate context. While Dr. Coleman indicated that he did not generally write down therapy notes (or that if he did, they would be handwritten), he stated that he did maintain typewritten medical records of his patients. (Dkt. 10-2 at 69, R. 68). Dr. Coleman also noted that he had requested his assistant to furnish these medical records to Lori's counsel. (Id. at 70, R. 69). The ALJ failed to address this representation by Dr. Coleman within her opinion.

The ALJ next discounts Dr. Coleman because he testified that he had not reviewed any other providers' medical records. Dr. Coleman is Lori's only treating mental health provider from the time she filed her application through the time of the ALJ's hearing. Thus, there would be no relevant records for him to review, other than the mental health consultative examination with Dr. Ascough in 2015, which occurred prior to Lori's March 2016 mental health hospitalization in Indianapolis and supported Dr. Coleman's diagnosis of major depression.

The ALJ also indicates that Dr. Coleman's medical opinion is inconsistent with the other evidence in the record, citing to four medical visits[6] where Lori had normal mental status examinations. (Dkt. 10-2 at 28, R. 27). The ALJ again fails to provide context for a portion of the visits. The first visit that the ALJ relies on occurred on January 14, 2016, when Lori was seeking treatment from Dr. Fischer for bronchitis and abdominal pain. (Dkt. 10-13 at 23-25, R. 667-69). It is important to note that this visit occurred before Lori was assessed by a mental health professional in March 2016 and received a formal diagnosis of PTSD.

Another medical record relied on by the ALJ to demonstrate inconsistency involves Lori's visit with Dr. Fischer on March 11, 2016 following her hospitalization in Indianapolis. During this visit, Lori explained her symptoms and possible diagnoses (to the best of her memory) to Dr. Fischer, who accepted her subjective complaints, included diagnoses of PTSD and possible psychological conversion disorder, and referred her to Dr. Coleman. Moreover, after her first visit with Dr. Coleman on April 18, 2016, he diagnosed her with depression and PTSD, which confirmed Dr. Fischer's diagnosis on March 11, 2016. (Dkt. 10-15 at 71-72, R. 858-59).

The ALJ also relies on Dr. Fischer's treatment notes from June 13, 2016 where he indicated that Lori had a normal mental status examination. At this visit, Lori was seeking treatment from Dr. Fischer for asthma and breathing issues. (Dkt. 10-15 at 31-34, R. 818-21). When conducting a critical review of the evidence, the Court notes that the normal mental status examinations relied on by the ALJ occurred

---

[6] These medical visits occurred on January 14, 2016; March 11, 2016; June 13, 2016; and October 3, 2016.

while Lori was actively participating in continuous treatment sessions with Dr. Coleman. It would not be inconsistent for Lori to have a normal mental status during primary care appointments while she is also receiving regular mental health treatment with Dr. Coleman.

During an October 3, 2016 follow-up visit with Dr. Fischer, Lori discussed Dr. Coleman's latest recommendation that she start a new medication for her fatigue and depression, a recommendation that was adopted by Dr. Fischer and resulted in the new prescription for Seroquel. (Dkt. 10-15 at 54-58, R. 841-45). The records cited by the ALJ to demonstrate inconsistency in actuality demonstrate that both Lori's treating psychologist and her primary care physician agreed on her diagnoses of depressive disorder and PTSD, and were in agreement as to the recommended treatment for those conditions.

Finally, the ALJ dismisses Dr. Coleman's medical opinion because his records contain no objective findings and are based solely on Lori's subjective complaints. Through *Aurand v. Colvin*, 654 Fed. App'x. 831 (7th Cir. 2016) and *Price v. Colvin*, 794 F.3d 836 (7th Cir. 2015), the Seventh Circuit has determined that psychological and psychiatric assessments are normally based on the patient's subjective complaints, and that it would be illogical to dismiss the professional opinion of a psychiatrist or a psychologist simply because that opinion draws from the patient's reported symptoms. If the Commissioner were permitted to dismiss those professional opinions, most mental health treatment evidence would be totally excluded from social security disability proceedings. *See Price*, 794 F.3d at 839. Moreover, for mental health conditions there often is not any objective medical evidence that can support a

diagnosis. It was improper for the ALJ to discount Dr. Coleman's medical opinion because it was based on Lori's subjective complaints.

To be sure, the ALJ issued valid criticisms of Dr. Coleman: she pointed to Dr. Coleman's lack of understanding of and familiarity with the SSA's disability programs and their evidentiary requirements, where he testified that he was not familiar with the SSA disability program and had never testified at a hearing until Lori's proceeding. (Dkt. 10-2 at 66-67, R. 65-66). But that unfamiliarity with the disability system is not enough to overcome the ALJ's failure to provide good reasons for completely discounting Dr. Coleman's medical opinion to the point of giving it no weight.

Lori also contends that the ALJ erred by not discussing Dr. Coleman's Medical Statement Concerning Depression with Anxiety, OCD, PTSD or Panic Disorder for Social Security Disability Claim, which he completed on April 25, 2016. (Dkt. 13 at 11). This medical statement form required Dr. Coleman to check appropriate boxes that corresponded with Lori's work limitations in various areas, such as the ability to understand and remember short and simple instructions and the ability to maintain attention and concentration for extended periods. (Dkt. 10-6 at 69-70, R. 327-28). Dr. Coleman indicated that Lori had the identified limitations due to her PTSD, major depression, ADHD, and possible bipolar disorder. (Id).

The Commissioner argues that it was appropriate for the ALJ to discount Dr. Coleman's Medical Statement because it was offered in a check-the-box questionnaire format. Treating physicians quite often complete check-the-box or fill-in-the-blank questionnaires to express their opinions about their patients' specific

abilities and limitations. *See e.g. Jelinek v. Astrue*, 662 F.3d 805, 811 (characterizing as "highly relevant" a doctor's assessment of his patient's symptoms and RFC as provided in a questionnaire). Like all treating physician opinions, those rendered in response to form questionnaires merit controlling weight when they are well-supported and not contradicted by other evidence in the record. *See, e.g. Stage v. Colvin*, 812 F. 1121, 1123-24 (criticizing an ALJ's rejection of an RFC questionnaire). The ALJ was not permitted to discount Dr. Coleman's Medical Statement because it was rendered in a check-the-box questionnaire format.

While ALJs are not required to address every piece of evidence in their decisions, *Arnett v. Astrue,* 676 F.3d 586, 592 (7th Cir. 2012); *Clifford,* 227 F.3d at 872, in this case the ALJ should have assessed Dr. Coleman's Medical Statement. This is the only piece of medical opinion evidence in the record that addresses Lori's potential functional limitations as a result of her depressive disorder and PTSD. The ALJ concluded in her opinion that she gave no weight to Dr. Coleman and his opinion that Lori met the Listings for affective disorders, anxiety disorders, and somatoform disorders. (Dkt. 10-2 at 28, R. 27). The ALJ did not indicate whether she gave any consideration or weight to Dr. Coleman's Medical Statement that contained specific functional limitations. Because the ALJ did not mention this evidence, it is impossible for this Court to determine the amount of weight the ALJ gave to the Medical Statement, or if the ALJ even reviewed that document.

The ALJ did not provide good reasons for discounting Dr. Coleman's medical opinion because, for the most part, the reasons provided were not supported by the

evidence. On remand, the ALJ should re-evaluate Dr. Coleman's medical testimony and opinion, along with his Medical Statement.

### C. RFC Analysis Supported by Medical Evidence

Third, Lori argues that the ALJ's residual functional capacity assessment is not supported by substantial evidence, based on two flaws. (Dkt. 13 at 11). She contends that the ALJ ignored Plaintiff's testimony that she needed to use a nebulizer machine about four times per day, which would require additional breaks or off-task time at work to accommodate. (Id. at 12). Additionally, Lori asserts that the ALJ improperly evaluated her activities of daily living. (Id. at 133).

The Commissioner argues in response that the ALJ did not err by not including a limitation regarding breaks for nebulizer use in the RFC. (Dkt. 19 at 19). Specifically, the Commissioner maintains that the objective medical evidence does not support nebulizer use four times per day, so the ALJ was not required to include a limitation for breaks and off-task time in the RFC. (Id. at 20). In regard to the activities of daily living, the Commissioner maintains that the ALJ merely recited Plaintiff's activities of daily living, but did not equate the ability to perform those tasks with an ability to perform full-time work. (Id. at 21-22).

The RFC is a determination of the tasks a claimant can do despite her limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). Although an ALJ may decide to adopt the opinions in a medical source statement concerning the ability of a claimant to perform work-related activities, the RFC assessment is an issue reserved to the ALJ. 20 C.F.R. §§ 404.1545(e), 416.945(e). When crafting the RFC, an ALJ

must include "all limitations supported by medical evidence in the record." *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004) (citing *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002)).

The Plaintiff testified that she uses a nebulizer four times per day. (Dkt. 10-2 at 61, R. 60). Both Dr. Fischer and Dr. Zaragoza prescribed a nebulizer for Lori to use up to four times per day. (Dkt. 10-15 at 58, 69; R. 845, 856). Most recently in January 2018, Dr. Zaragoza provided Lori with a nebulizer prescription to be used up to four times per day, with the ability for Lori to refill the prescription five times. (Id. at 69, R. 856). Lori has presented medical evidence to support her use of the nebulizer four times per day. Neither party, however, presented the ALJ or the Court with any evidence as to how long it takes Lori to administer her nebulizer; whether the device was portable and could be used away from home; or what schedule Lori followed while using the device.

This Court recently addressed a similar issue in *Gary B. v. Berryhill*, where it was determined that "[a]n ALJ may be obligated to address a claimant's ability to sustain work, if the claimant presents sufficient evidence demonstrating that the ability would be precluded by treatment visits which are necessitated by the claimant's impairments." No. 1:18-cv-833-JMS-TAB, 2018 WL 4907495, at *4 (S.D. Ind. Oct. 10, 2018). In that case, the claimant failed to produce any evidence about the length or frequency of his medical treatment visits, and whether it would be difficult to schedule those visits around a full-time work schedule, so the Court concluded that the claimant had not met his burden to produce sufficient evidence that he could not meet the demands of full-time work.

Similarly, here, Lori has not presented any evidence as to the necessary length or timing of her nebulizer treatments. If Lori spends five minutes using a nebulizer every four to six hours, that could likely be completed during a regularly scheduled break throughout the workday. If each nebulizer treatment took an hour to complete, however, that may very well preclude Lori from maintaining full-time work because regular breaks in a full-time position may not accommodate the extent of that treatment. That information, though, is not before the Court at this time – only speculation exists. Lori has failed to present sufficient evidence demonstrating that her nebulizer treatments would preclude her ability to sustain work. Accordingly, the ALJ was not required to address how Lori could maintain employment while receiving nebulizer treatments for her breathing impairments.

Lori also argues that the ALJ placed undue weight on her activities of daily living when determining that she could perform full time light exertion work. SSR 16-3 advises adjudicators that they should consider a claimant's activities of daily living when evaluating the severity of the claimant's symptoms. As the claimant points out, the Seventh Circuit has criticized ALJs who infer an ability to perform full-time work from an ability to perform activities of daily living. *See Stark v. Colvin*, 813 F.3d 684, 688 (7th Cir. 2016); *Moore v. Colvin*, 743 F.3d 1118, 1126 (7th Cir. 2014); *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013). In the same vein, the ALJ must review the evidence, including a claimant's activities of daily living, to assess whether a claimant is exaggerating the effects of her impairments. *Alvarado v. Colvin*, 836 F.3d 744, 750 (7th Cir. 2016).

Here, there is no evidence that the ALJ overstated Lori's ability to perform activities of daily living. She noted that Lori was able to cook, perform household chores as needed, handle money, and pay bills. (Dkt. 10-2 at 22, R. 21). The ALJ further noted that Lori does not socialize with neighbors and goes to the grocery store late at night to avoid crowds; that she drives and occasionally goes to Walmart; and that she has difficulty getting along with others but does socialize via texting. (Id). Although the ALJ summarized Lori's testimony about her ability to do housework and other tasks, the Court fails to find that she inferred from those statements that Lori was capable of full-time work. *See Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016) (noting that ALJ discussed claimant's performance of activities of daily living but did not equate it with ability to work). Instead, the ALJ evaluated Lori's daily activities against her asserted impairments and found that Lori's statements regarding the severity of her symptoms were not consistent with the evidence in the record. Although it is true that ALJs should not equate daily living activities with an ability to engage in full-time work, there is no evidence that the ALJ did so here. For these reasons, the Court finds that the ALJ conducted a proper RFC analysis and, thus, the Court will not disturb that assessment.

### D. Listing 3.02A

Finally, Lori asserts that the ALJ erred by finding that she did not meet or medically equal Listing 3.02A for chronic respiratory disorders. (Dkt. 13 at 13). She argues that she completed a pulmonary function test with the SSA consultative

examiner on September 25, 2015, which revealed that her FEV1 was 0.95, well below the FEV1 criteria needed to meet Listing 3.02A. (Id. at 14).

The Commissioner argues in response that the ALJ appropriately determined that Lori did not meet Listing 3.02A because she did not complete the pulmonary function test on September 25, 2015. (Dkt. 19 at 13). Moreover, a few weeks later Lori completed a second pulmonary function test, while giving "suboptimal effort." (Id. at 14).

Here, during the Listings analysis, the ALJ states:

"All of the listings were considered in reaching this finding, with specific emphasis on listings 3.02 (chronic respiratory disorders) and 3.03 (asthma). The record indicates that the claimant was unable to complete pulmonary function testing during a consultative examination (6F/2). Pulmonary function testing in October 2015 indicated that the claimant gave suboptimal effort. This record does not establish the severity required under the listings.

(Dkt. 10-2 at 22, R. 21).

For the SSA, spirometry (pulmonary function testing) involves "at least three forced expiratory maneuvers during the same test session." 20 C.F.R. Part 404, Subpt. P, App. 1, Listing 3.00. The September 25, 2015 test administrator, Dr. Conrardy, indicated that Lori could not complete the pulmonary function test due to wheezing, vomiting, and coughing, and wrote on the results page "Caution: No Acceptable Maneuvers – Interpret With Care." (Dkt. 10-11 at 67, R. 569). Dr. Conrardy stated that Lori did not complete the pulmonary function test, and that no acceptable maneuvers were available for interpretation, even from the testing portion that was completed.

(Id). Thus, the September 25, 2015 test could not be used for determining whether Lori met or equaled Listing 3.02.

As to the October 5, 2015 pulmonary function test, Dr. Deshpande performed the test and indicated in his notes that Lori gave "suboptimal effort." (Dkt. 10-11 at 72, R. 574). In order to accept respiratory testing, the SSA notes: "[y]our forced expiratory maneuvers must be satisfactory. We consider a forced expiratory maneuver to be satisfactory when you exhale with maximum effort following a full inspiration . . ." 20 C.F.R. Part 404, Subpt. P, App. 1, Listing 3.00. Lori did not give maximum effort during this test, so the results cannot be used for determining whether Lori met or equaled Listing 3.02. Accordingly, the ALJ's conclusion that no records were available to establish the severity of Listings 3.02 and 3.03 was correct. On this issue, the ALJ's decision is affirmed.

## V.    Conclusion

For the reasons detailed herein, this Court **REVERSES** the ALJ's decision denying Plaintiff benefits and **REMANDS** this matter for further proceedings pursuant to 42 U.S.C. § 405(g) (sentence four) as detailed above. Final judgment will issue accordingly.

So ORDERED.

Date: 2/28/2020

Doris L. Pryor
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record via email